Our first case is Amgen v. Sandoz et al. 2022-11-47. Ms. Berger. Good morning. May it please the Court. For this argument, I'd just like to focus on two points, and they're both related to the 638 patent and the findings in the District Court on motivation and reasonable expectation of success. So, the District Court made findings here that support a finding of motivation to separate the enantiomers of Example 12, which is the example disclosed in the 358 patent. The District Court found that the 358 patent teaches Example 12 and that it has therapeutic utility. The Court also found that the 358 patent teaches that the isomers of the compounds in the 358 patent are part of the invention of the 358 patent. And so, therefore, the reasonable assumption is they would also have therapeutic utility. And that's what is needed to provide a motivation to separate the enantiomers of Example 12 and determine which of the enantiomers has the therapeutic benefits. There was support in the record as well for the finding that there would be motivation to separate the enantiomers. The FDA's policy by 1992, which is 10 years before the priority date here, was to separate enantiomers and figure out what the activity of the enantiomers was. Dr. Davies, the expert for Amgen, also testified about his article in the... Can I ask you about the potential patent admission in the 638 patent? Yes. I'll let you start us there. That's a good starting point. It appears that the 638 patent admits that a primolas, am I saying that right? Yes. A primolas can be isolated through chiral salt formation. Is that correct, that that's what the 638 patent is saying? That's what the 638 patent says, yes. Okay. Now, is that true in the real world? Is that... In the real world, there's not any evidence that that would work. I think the record evidence is that you would not be able to separate a primolas from its racemic mixtures using chiral salt. Well, that's against your position, right? That's... Yes, it's against my position, but... You're arguing that it would have been obvious. I'm sorry? You're arguing that it would have been obvious to separate them. Correct. It would have been obvious to separate them. There was a technique taught in the 358 patent, as well as an admission in the 638 patent, that chiral chromatography would work to separate the enantiomers. And there was no testimony... There was testimony that it would, and there was no contrary testimony that it would not work to separate the enantiomers. So, while there was one method that might not work for a primolas, there was absolutely, and they are disclosed, a method that would work for a primolas, which is chiral chromatography. But wasn't it determined that the enantiomer, positive enantiomer, was 20 times as active as the racemate? Isn't that an unexpected property that overcomes any obviousness argument? I would say it's a difference in degree, not in kind. And there is an admission in the record that a person of skill would expect a two-fold increase. So, they would expect a difference between the enantiomers, and I think that's enough to establish a difference in degree rather than in kind. While there was a large... You mean 20 times isn't an enormous difference over two times? It's a difference. It's definitely a difference. I think the issue is whether that would be a difference in degree or in kind, and the law says that a difference in kind is not enough to establish unexpected results. Is that maybe itself a fact question? At what point do we go from a difference in degree to a difference in kind? I think it might be a fact question in a certain circumstance, but I think in this case, I don't think there was any finding that there was a difference in kind here. I think the finding was just that it was an unexpected result. So, I would say the court does not need to defer to that as a fact finding. Let me just get back to that admission. I apologize that I'm unfocused on that, but it's something I want to hear more about. What is the import of the admission being inaccurate? Because I think when we talked about it, I think you were saying that is an admission in the 638 patent, but then it sounds like you're saying it's not true in the real world. What is the import of inaccuracy there? I don't think there is any import in inaccuracy there, mostly because there wasn't any... There was testimony outside of the admission that a Premalaz specifically was difficult to isolate. The testimony that was taken by the court was that enantiomers sometimes are difficult to isolate and that there are things that you might have to do in order... But this is not a case like Forrest where there was testimony specifically directed to acetalopram and how difficult that particular isomer was to isolate. There's no testimony about a Premalaz specifically being difficult to isolate. So, I don't think there's much import that would take away from the admission in the 638 specification that these were techniques that you could do in the art. And they were techniques that were known and were routine. A person of skill in the art at the time would have been able to do these isolation techniques and maybe figure out that chiral salt acids won't work, but chiral... And what's your best case that you're relying on with respect to the admission? Pharmastem, therapeutics is the case. I think that's the main case. Does Pharmastem stand for anything more than just we have to give credit in some way to the admission? Isn't that all it says? And yet you argue that this is somehow dispositive, I think. That's where I'm not quite clear on how Pharmastem gets you to this being a dispositive issue. I think the problem is the court didn't consider it at all. The court did not... I think you know that he recognized it in footnote 17. He recognized that there was an admission. He doesn't give it any weight at all. And I don't think there's any evidence in the record that he actually weighed the admission on any level or weighted it as part of the legal analysis. Why would we presume that he, in noting the admission, at least in a footnote, then gave it... If he gave it no weight, it was presumably because he found it merited no weight. I think it probably required some sort of an explanation for him as to why it was outweighed by the evidence that was put in the record. And again, this relates, it goes back to what the testimony was about a Premalast and how difficult it was to... In particular, Premalast was to isolate. There is no testimony that a Premalast in particular was difficult to isolate. Only that enantiomers are generally difficult to isolate and that you would have to run some experimentation in order to determine whether or not you could do that. Are you familiar with the Nomia case, the Judge Rich case? Are you familiar with that case? I am not familiar with that case. I'm sorry. So just to close out because I'm running low on time. I think the other issue here is the misapplication, I think, of the lead compound analysis that the district court engaged in. The district court placed a lot of weight on Dr. Davies' testimony that a person with a skill in the art would have to separate all 17 examples in the 358 patent and test them all to determine which ones had activity. I don't think that would be a lead compound analysis and that is not required here. He correctly found that it wasn't required here. The district court said lead compound is not required, but you do have to start somewhere, don't you? I think under the case law, you start at example 12. That's what you start at. You would start at example 12, so you don't have to choose example 12 among the... You don't have any burden to show that there's some reason to even think about example 12 as a starting point? Not under Aventis or UCB for that matter, but I will reserve the rest of my time for both. We will hold it for you, Ms. Horowitz. Thank you, Your Honor. It may have pleased the court. I want to pick up with the question that Judge Stark just asked, which is, can you just start with example 12? I think it's clear across the law of obviousness, not merely in the lead compound context, that you need to put yourself in the shoes of the skilled artisan at the time of the invention who doesn't already know about the invention and identify some reason why that person would have plucked a given teaching out of the prior art in order to solve a problem. Now, lead compound analysis is one framework the court has used to address that question, but there are many different frameworks. A fundamental inquiry is the same in each case, and it's critical for guarding against hindsight. Now, in this case, the framework that this court applied was exactly the one that defendants asked it to apply, the Aventis standard. But even there, they needed to show that there was a reason to believe that a desirable property of the mixture derived from creme last in particular. Now, that's a factual question, and defendants lost on the facts under their own test. Based on the factual findings, they do not actually challenge this clearly erroneous. Another factual question, though, is how difficult, if at all, would it have been, assuming you had some reason to do it, to actually isolate this isomer. In that regard, it seems like your patent admits it would be, at worst, routine experimentation, and it seems like the district court put a lot of weight on the contrary view of your expert that it might be challenging. What do we do with that? So what the patent teaches, and we don't dispute it, is that once the inventors had isolated a creme last, they could teach the world it was possible to do so. It doesn't say through routine experimentation, ex ante, you could have. That's not what it says, and it teaches a specific method of doing it in columns 21 to 22. But you're right. It is a factual question, and it's a factual question as to which the district court said, It's a battle of the experts. I have Dr. Davis explaining why it's quite difficult, and I have Dr. Gribble explaining why it's quite easy, and he found Dr. Davis more persuasive than Dr. Gribble in this regard. As Dr. Davis said, ex ante, yes, you knew about general techniques. You know chiral chromatography was a technique you could try. We'd have to pick one of 50 possible columns, any number of solvent systems. You'd have to adjust the pH, the temperature, the flow rate, and as Dr. Davis testified, all you could do is vary these parameters, put your compound on the column, and hope. Hope that you got the separation. But until these inventors did it, you didn't know it was possible. So I'm going to take you down some of the same lines of questions that I took the other counsel down, if you're ready for them. So first off, are you familiar with the Nomia case? I'm not. I don't believe we cited it. So I believe Pharmastem cites Nomia. It's a judge-rich opinion, and in particular, and I think multiple of our cases say something to the effect of that the patent's admission in the prior art would be binding on patentees. What is your response to that and that sort of line of cases? So we take no issue with the admission that it is possible to isolate a premolast. What it says in column 9 is compound A can be isolated from the racemic compound by techniques known in the art. That is a teaching of the inventors, and we don't take issue with it. We accept it as true, and in fact, the inventors did teach how to do it. They taught a specific method in columns 21 to 22. The difference in Pharmastem applying that Nomia case was that the patentee was trying to dispute a fact about what was in the prior art. The patentee said no one knew that cord blood contained stem cells, but the patent said cord blood has been shown to be in stem cells, citing prior art that taught that. So again, we take no issue with the so-called admission. We take it as it is, but the disclosure of general techniques and even the disclosure that general techniques can work is not an admission that a person of ordinary skill at the time of the invention in 1999 would reasonably expect to be able to isolate a premolast from a racemic mixture. And the district court found exactly the opposite, crediting Dr. Davis' testimony over Dr. Gribble's. So that's as far as it goes. It's just a factual question. Similarly, with respect to the objective evidence, Judge Stark, you were mentioning isn't a 20 to 1 versus 2 to 1 difference, first of all, it sounds quite surprising and different, but on top of that, isn't it a factual question? Defendant's own case on this subject, the Merck case, the one they point to for degree versus kind, you read further down on the same page and what you'll see is sometimes a difference in degree is so substantial that it's truly unexpected. When is that? That's a factual question, a factual question reserved for the district court and resolved in our favor, along with numerous other factual questions on the objective evidence, which the district court said strongly supported a conclusion of non-obviousness. They don't even challenge the fact that there was skepticism towards a premolast, both at the FDA and in industry, that others wouldn't take a license to a premolast even after seeing the outstanding properties that had been showed. They don't take issue with the fact that Otesla, the commercial embodiment of the claimed invention, satisfied a long-felt but unmet need for an improved treatment for psoriasis. There is no challenge to any of this. And critically, this court has never held that an enantiomer was obvious over a racemate in the presence of a finding of unexpected results. In this case, you see 20 to 1 difference in potency. In Forrest Lab's, 2 to 1 was enough to be unexpected. You're saying it's not a question of difference in kind versus degree, it's unexpectedness. It's unexpectedness. It's simply a question of fact. What would a person of skill in the art expect? And the testimony in trial was that, not that 2 to 1 was expected, to be clear, but that 2 to 1 is the most that you could reasonably expect because that's a situation where one enantiomer has all the activity and the other one has nothing. In this situation, we had... I want to go back to that statement that you made right before Judge Lurie's question. You said something to the effect of, the court has never held. Can you repeat that? I want to maybe explore that. The court has seen a lot of enantiomer cases, and in no case... You say a lot. Can we put a number on that? Sanofi, Forrest Lab's, UCB, Henry May. At least a half a dozen. At least a half a dozen. Okay. And there are a couple of cases in which obviousness was shown. In no case was obviousness established in circumstances where there was a finding of unexpected results. But those are all very fact-specific, right? There's no per se rule that you're saying our court has said in that regard. Absolutely. 100% agree. Each case is fact-specific. That's what Sanofi teaches. And in this case, we have factual findings resolved across the board in our favor. With the remaining time, I'd like to turn, if I may, to the 541 patent. Now, this patent claims a very specific dosing schedule, and the problem is that the district court simply failed to make findings to explain why a person of ordinary skill would have been motivated to make the very specific choices reflected in that schedule. And a lot of the choices were counterintuitive. Isn't that ordinary experimentation? After all, drug developers always have to determine the proper doses of a proposed drug, and was it the pap reference here illustrated that? So the point is that there is a very specific set of choices reflected in that schedule, in the claim schedule, that's different from pap. And those choices, as compared to pap, go against a lot of the intuitions of a skilled artisan at the time. And if you didn't already know what the invention is, there is no explanation in the court's findings as to how you get to several of these specific choices, and certainly not all of them together. So, for example, the prior art already taught a schedule that was eight days long and got to 40 milligrams maintenance dose. We're trying to get to 60. Now, the question is, if the prior art schedules weren't sufficient to manage the dose-dependent tolerability concerns, why would you go backwards to six days as opposed to do the typical thing, as the testimony established, which is titrate over weeks or months, as was done with many other psoriasis medications at the time, such as acetretin or methotrexate? There's no explanation as to that choice. Or, for example, why do you sometimes have the same dose morning and afternoon, but other times different doses, what we call asymmetric doses? There was literally nothing in the prior art that had a single day of asymmetric dosing. Pat, same morning and evening. Chet, single dose most of the time, but at the maintenance level, same morning and evening as an option. The 5-3-6 pattern, which they call a key reference, teaches evenly divided dosing. What explains this particular choice? It was incumbent upon the district court to make a finding to explain how a person of skill would have been motivated to make the choices that arrived at the invention. Didn't make that explanation. Or take another. Every developer is motivated to experiment and determine the proper dose. And whatever comes out, comes out. So, Judge Lurie, in terms of the maintenance dose, figuring out where your target is, I don't dispute it. It was already established. 60 milligrams is the maintenance dose. The claim is not figure out the proper maintenance dose. The claim is 10 milligrams in the morning, day one, nothing in the evening. Then 10 and 10, 10 and 20, et cetera. It's got a lot of specific limitations, which were simply not addressed. Was the 8-day schedule for psoriasis, or was it for something different? The 8-day schedule was for psoriatic arthritis. If you want to look at the PAP schedule, even then, which is the psoriasis schedule, there's another choice that's not explained. So in PAP, you hold the same dose constant for at least two days at a time. Two days of 10 and 10, two days of 20 and 20. In SHET, which is the psoriatic arthritis, you hold it for three days and then four days. Dr. Gilmour holds it for 20 days at one point. So why do you make the choices to go from holding it constant for two days to increasing it every single day if the goal was to manage tolerability concerns, to ease into that maintenance dose? There's absolutely no reason, explained in the findings of FACT, as to why you choose increase every single day as opposed to every other day in PAP, every third or fourth day in SHET, or, as I said, conventionally, you'd go to the doctor, you'd get your first dose, you'd come back a month later, doctor would say, how's it going? And then you'd adjust. Was there evidence that these doses produced unexpected results over a simpler dose regimen? We did not rely on objective evidence at trial. But with respect to motivation, it's the same test for this and PAP. You're asking for unexpected evidence to be given primacy on your main argument, but you don't have it here. I don't think the absence of unexpected results means that the invention is obvious. I certainly believe that the unexpected results with respect to the 638 are sufficient all by themselves to justify affirmance. What is your best case where strong unexpected results outweigh an overall strong obviousness case? I think the most relevant case in this context is the Sanofi case. In that case, the district court actually had presumed a prima facie case, and nonetheless, there was a finding of non-obviousness based on the unexpected results. So again, we're in this world of enantiomers and racemates, and it's a really consistent thread. If you go back to the old cases, Henry May, Adamson, et cetera, the one consistent thing you'll see is when there's unexpected results, no obviousness, and when it's exactly as expected in Aventis, then there was obviousness. That's the basic dividing line in those cases. Can I ask a question on the 101 patent? Sure. Do you contend that the 515 provisional patent application actually did disclose the Form B, or do you need the expert to say the Form B is in there? So I think the answer to the question is yes to both in a way. There's no question that the inventors of the 101 patent at the time of the filing of the provisional application possessed the solid form that was recrystallized at the end of the reaction in Example 2, and that's what's claimed ultimately in the 101 patent. It's claimed with respect to certain properties that were inherent in it, so it discloses that form. The factual dispute that required an expert is the testimony that that form was necessarily always inherently Form B, and that's what it is. So yes, the 515 discloses Form B. It doesn't say the words Form B. It doesn't have the XRPD peaks that are characteristic of Form B, but it inherently discloses those because it discloses that the inventors possessed what was recrystallized. But 112 requires disclosure, not inherency. To get the benefit of prior application, there must be disclosure. Now, the district court looked at all the evidence here and found that the 515 application did in fact disclose Form B, but that's sort of a better argument for you, isn't it? Yes. Inherency? I think inherency explains where the properties are, but absolutely the district court found that it disclosed Form B. It's not a question of properties. It's a question of the substance. Yes. The substance was disclosed. Absolutely. And that's the finding. And that's exactly, going back to the CCPA, that's what happens in Edwards, for example. It was disclosed that they had this reaction and they had the product of the reaction, and they later claimed it by name, and that wasn't an issue. I'd like to reserve the balance of my time for rebuttal, if I may. All right. And of course, that's only for the cross-appeal if there's something to reply to. Ms. Murka. Thank you. You have six minutes. So just briefly on the 638 patent, the disclosure in the patent, in the 638 patent itself, actually teaches specific prior art methods. It lists several references here that disclose prior art methods for resolving the enantiomers. So that's not an inventor's own teaching there. That's actually a concession that the prior art... Is that a fact question or a question of law, whether it's the inventor's own contribution or whether it was not? I would say it's a question of law based on a reading of the specification itself. But to the 541 patent, I think there's a couple of things. First of all, PAP, the psoriasis study, is the closest prior art, not the 40-milligram psoriatic arthritis study, and I think that was conceded in the district court by Amgen's expert. And I think the argument that the court was required to make findings about why a person of skill in the art would select the prior art method over something that was not supported in the prior art is the basis for their argument, and I don't think that actually has any weight in the case law or in the facts of this case. You're not addressing 20 times, which was unexpected. So I would, again, maintain that that's a difference in degree, not in kind, John. But that's not the issue. Unexpectedness is what carries the day with non-obviousness. So, and I agree with you, but I think that this court has held that a difference in degree versus a difference in kind is the standard for how to determine whether something is unexpected. What is the dividing line between a difference in degree and a difference in kind? I think in the type of difference it is. If it's a difference that produces something that's not, so we have a concession here that there would be an expected difference between the two enantiomers, expected two-fold difference between the two enantiomers, and in that case, then we're talking about two versus 20 is a difference in degree, not in kind. If you have a claimed compound and it's close structurally to a prior art compound with the same activity, and the claimed compound has 100 times the activity of the prior art compound, that doesn't carry the day because it's just a difference in degree? I would say that's a difference in degree. Now, if it's an unexpected difference in degree, I guess that would be a point. Well, that's the point, unexpectedness. Understood. So just to discuss the 541 briefly, there was plenty of evidence in the record to support the court's decision here. The claims here are to a dosing titration schedule where you give 10, then 10 and 20, then 20 and 20, then 20 and 30, and then 30 and 30 for the... How about the asymmetric dosing on a particular day? Was that in the prior art? Asymmetric dosing was not in the prior art, but the testimony that would lead you to asymmetric dosing I should just add, there's no evidence at all that asymmetric dosing does anything. What there is evidence of is that patients were administered 10, 20, and 30 milligram doses. Patients, not healthy subjects, we're talking about patients that actually had psoriasis, were administered those three, that a person of skill in the art would understand from the PAP trial that there were still some adverse events happening in the first couple weeks and would want to slow down the titration there, and that a normal way to do that, a perfectly reasonable way to do that would be to increase the dose titration by 10 milligrams every day rather than 20 milligrams. So you start at a lower dose, which their expert conceded would be expected to produce fewer side effects. You start at 10 milligrams, and then you increase by 10 milligrams every day instead of 20 milligrams every two days. That would lead you to asymmetric dosing. Given the dosing types that you had, the 10, 20, and 30, that's the only way to get you to increasing 10 milligrams a day up to day six. That's how you get exactly to the schedule. And that's what the judge found in this case. He relied on the testimony of Dr. Gilmour, and he gave deference, which he found... I want to make sure I get your take on this secondary considerations or objective indicia point. I assume that you agree that they must, of course, be taken into account, but they don't necessarily control the obviousness determination. Is that true? That's correct, yes. Just because some of your communications back and forth with my colleagues, I felt like you were almost conceding that you thought one given secondary consideration would control the obviousness determination. I don't think one given secondary consideration. If I made that mistake, I apologize. I do not think one unexpected result controls the... or one objective indicia controls the obviousness determination. I don't think that's been the law in this circuit ever. But there was commercial success and maybe a couple of secondary indicia weren't there? There were other objective indicia. They were all related to not really comparing a primal ass to the racemic mixture of example 12. They were comparing a primal ass to other drugs on the market. They were comparing it to... I think most of them were comparing it to other drugs on the market. But it was a real success. It certainly was. There was a 358 patent in the way. That's why you won it. There were other things that would kind of create this wall that would make it difficult for someone to enter the market. And one of them was the 358 patent was in the way. And that was not an issue in this case, but that's one patent that was in the way. But just to round out the 541 before I run out of time, the court's decision was supported. And these specific things like asymmetric dosing and doing one dose on the first date was all just a natural result of taking the steps one at a time which is testimony that the judge specifically credited and was supported in the record. Thank you. Thank you, counsel. Mr. Horowitz has about a minute of rebuttal left on the cross-appeal. Can I just ask you, has this court reviewed, for obviousness, a titration dose schedule patent? And if so, what was the outcome? Well, the endopharmaceuticals case is a kind of a dose titration type of case. It's a dosing case adjusting to get to the maintenance dose and involved an affirmance of non-obviousness in that case. So that's the one I'd point to. I'd just like to start by pointing out that as this court held in Mintz, obviousness requires a form of amnesia where you forget about the invention and think about what a person of skill would do, what would they be motivated to do, not knowing what the invention is. Counsel just admitted that asymmetric dosing wasn't even known in the prior art at all. That's the record. So it was incumbent upon the district court to at least explain how is it that a person of skill would be motivated to do something that no one had done before. Now, what counsel just said was, well, that's the only way to get there given the dosage forms available. She didn't cite a finding of the district court because no such finding exists, and it's inconsistent with the record. It's not as if Otesla was on the market and you're going to the pharmacy and picking up your 10, 20, and 30 milligram dosage forms. The prior art taught 5, 10, 15, 20, 25. All of that is at page 10607 of the joint appendix in column 13 of the 536 patent, a key reference. And Dr. Alexis testified similarly. In light of the absence of findings, we'd ask the court to at least vacate what we think you should reverse outright, the judgment with respect to the 501. Thank you to both counsel. The case is submitted.